Next case on the call is Henry Marriage of Vargo, number 5, 140012. Counsel may proceed. Good morning, May it please the Court. My name is Michael Stoll. I am here on behalf of Victoria Vargo. As the case caption demonstrates, this arises from a dissolution of marriage proceeding. The issue before the trial court and the issue now before this court is whether my client, Victoria Vargo, fraudulently induced Mr. Vargo, Adam Vargo, into entering into a joint hearing agreement and marital settlement agreement, a right that were both incorporated into the party's judgment for dissolution of marriage. So before I proceed with the substantive argument, and the trial court did indicate this in the order, that the timeline and the facts are very important to the understanding of this case. So I'm just going to go briefly and quickly through the facts. After four and a half years of marriage, Mr. Vargo filed a petition for dissolution of marriage. The parties have one daughter, Addison, who was five years old at the time of the trial. At the time the petition for dissolution was filed, Mr. Vargo was residing in Harrisburg, Mrs. Vargo was residing in Marion, Illinois. Now, during the pre-decree dissolution proceeding, there was an issue regarding custody. Each party wanted residential custody of Addison. A GAL or a guardian liable was appointed to do an investigation. After five months of the investigation, the GAL issued a report, filed it with the court, recommended that Mrs. Vargo should be awarded sole residential custody, that Mr. Vargo be awarded reasonable visitation. Now, seven months elapses between the issuance of the GAL's report and the mediation, and I'm going to go back to this mediation during my argument. This mediation session is very important. There's a mediation between both parties and the Guardian of Life. It transpires one month prior to the entry of the judgment of dissolution, which Mr. Vargo wants to set aside on the grounds of fraud. During this mediation, it lasts three hours. During this mediation, Mr. Vargo states that Mrs. Vargo made the statement to him that she had no plans to leave the southern Illinois area. Now, prior to this mediation, the record is replete with references that Mrs. Vargo had no plans to leave the area. Mrs. Vargo testifies that she did indicate during that session she had no plans to leave the area. Mr. Vargo also testifies that during the mediation, one of the most substantial issues that the parties tried to resolve was whether a radius restriction would be placed on Mrs. Vargo. Now, a radius restriction on how far she could move a minor child from the southern Illinois area. All other issues were resolved. Custody, visitation, all other agreements were resolved. Mr. Vargo wanted the imposition of a radius. Mrs. Vargo said no. Following the mediation session, the GAL wrote a letter to both attorneys saying all matters are resolved. One issue remains. That's the radius restriction. You're going to have to take this to the court. The record is not reflective of what transpired between the time of the mediation session and one month following the entry of the judgment. But what we do know, the entry of the judgment did not provide a radius restriction, provided the parties be awarded joint custody, that Mrs. Vargo would be the residential custodian. Now, one month following the entry of the judgment, Mrs. Vargo issues a, or sends a resume to an employer in Frankfort, Illinois, which is approximately four and a half hours from her residence in Marin, Illinois. She sends it to Chicago Academy of Autism. A month following that, she receives a job offer and accepts that offer. Notifies Mr. Vargo that she'll be moving to the Chicagoland area nearest Frankfort, Illinois. Following this notification to Mr. Vargo, the parties each file motions to modify the judgment. Mr. Vargo asks to modify the judgment to award him custody. Mrs. Vargo asks to modify the judgment relative to the visitation in light of her move from Marin to Frankfort, Illinois. Now, in the midst of these motions, Mr. Vargo files the substantive motion which is here now today before this court, which is the motion for relief from judgment on the grounds of fraud. Trial court hears that motion and grants that motion and believes that a fraud has transpired. So that's the factual setup. There's two main points, substantively, that I presented in my brief and I would like to argue today. The first is, under the four elements of fraud, the first element is whether there's a misstatement of fact. Now, the only evidence that Mr. Vargo presented during the course of the trial that evidenced any, even suggested that there was any sort of fraud, was his testimony of a witness by the name of Tammy Detsch. And I'm probably mispronouncing her name. Now, Ms. Detsch testifies. Two years prior to the entry of the judgment, she's having a backyard barbecue. Ms. Vargo appears and says the following. I'm going through a divorce. My house is up for sale, but not really. And in two years, I have a friend that's going to get me a job up north working with autistic kids. Now, who's Tammy Detsch? Tammy Detsch turns out to be one of Mr. Vargo's aunt's, quote unquote, very good personal friends. She apparently tells this to Adam's mother subsequent to entry of the judgment, and then we set on this path regarding the relief from judgment. Why isn't the weight that the trial judge gave to her testimony a call for the trial judge to which we would normally defer? Yes, and the manifest weight standard states that there's got to be a clearly apparent other set of circumstances that are clearly apparent. The testimony of Tammy Detsch, which is the only testimony or argument that's presented that there was some sort of planned prior to entry to judgment, first off, her memory is wholly lacking in this matter. On several different occasions, at least three that I said in my brief, she has to have her memory refreshed from her deposition transcript. She even states during her testimony that my memory is so bad, don't go back and look at my history grades. She testifies that she remembers very little from the conversation that she had with Ms. Vargo two years prior to the entry of the judgment. She testifies that of the very little she remembers, she's likely paraphrasing. Specifically, and it's called in this court's attention, she's asked whether she specifically remembers Ms. Vargo talking about teaching autistic children. On the stand, she states, well, I don't particularly remember that. But then when refreshed her memory from her deposition, she did in fact say that. Now, more specifically to your point, Justice, there's plenty of evidence in the opposite direction that suggests that there was no plan, that Tammy Deutsch's testimony is inaccurate, that the genesis of this position in Frankfurt, Illinois, occurred after the entry of the judgment. We have evidence that demonstrates that a resume was submitted after the entry of the judgment. There was a conversation between Ms. Vargo's employer and herself that occurred, frankly, one month after this alleged conversation between Tammy, wherein the future employer and the conversation between Ms. Vargo is strictly about divorce cases, has nothing to do with employment. We see that a job offer is made after the entry of the judgment. We see the job is accepted after the entry of the judgment. So there's substantial evidence in this case that demonstrates that Ms. Deutsch's testimony, one, is inaccurate, and two, her memory is severely challenged. The trial court, in its definition of clear and convincing proof, uses the Black's Law Dictionary to define what clear and convincing evidence is, and it states that the witnesses clearly and accurately can narrate exactly what happened. We can't say that for Ms. Deutsch. The fact that a witness would get on the witness stand and refer to her memory saying, gosh, don't look at my history of grades, demonstrates that this is not a witness that can narrate exactly what happened and accurately refer to what happened. Well, what you're describing, though, I mean, getting back to Justice Goldenhurst's question, there's conflicting evidence. The trial judge heard that conflicting evidence in a bench trial, weighed the credibility of the witnesses and the weight to be given evidence. It's pretty strong deference that we're supposed to give the trial judge in a bench trial. You have to convince us that an opposite conclusion is clearly apparent. And I understand that, Justice Stewart. I believe it goes to your point just now about weighing that evidence. I believe that the testimony of Tammy Deutsch should be, frankly, far less based on her inaccuracies, as well as the fact that I talked about in my brief, there's a bias. We have on the opposite side substantial testimony and, quite frankly, evidence that both sides submitted evidence that show that the genesis of this position in Frankfurt, Illinois, occurred after the judgment. We have credible evidence that each side, frankly, submits into evidence that shows that she did not have a plan two years prior to the entry of the judgment. In fact, this job arose subsequent to the entry of the judgment. So more to your point, I understand that the trial court is – has – its responsibility is to weigh the credibility of the witnesses and assign proper weight to their testimony. The trial court, frankly, assigned unnecessary weight or undue weight to Ms. Deutsch's testimony in light of the fact that the overwhelming amount of the evidence on the opposite side demonstrated that the genesis of this – of this job occurred after the entry of the judgment. Well, the trial judge is also entitled to draw inferences from the facts and evidence, right? And it sounded like the trial judge thought it was kind of fishy that 26 days after the judgment was entered, she was sending resumes to the Chicago area after she said she really had no plans to do anything before that. And I think that goes to my justifiable reliance argument. We need to look – also look at the terms of the judge – or the parenting agreement. The parenting agreement contemplates a relocation. It contemplates a change in circumstances. There was no specific language entered into the parenting agreement that did not allow Ms. Barbo to do what she, in fact, did. There was nothing preventing her in that agreement from sending off a resume to Frankfurt, Illinois, to Chicago, Illinois, to Rockford, Illinois. So while the trial judge might have drawn an inference and said, well, I find that to be quite fishy, quite frankly, she wasn't prohibited from doing the thing that she, in fact, did. Mr. Barbo took a calculated risk. He didn't. But wasn't one of the bones of contention the feeling of both Mr. Barbo and his family that as soon as she was able to, she would leave? Correct, and that's absolutely correct. So how can you say that there is – that this isn't a credibility call and that the opposite conclusion by the trial judge is clearly apparent? So your point about the family and Mr. Barbo in advance being concerned about a removal to the Chicagoland area or out of the southern Illinois – Removal, basically is the way they phrase it. Right. That was part of Mr. Barbo's calculated risk. He comes to his mediation one month prior to the entry of the judgment, lobbies hard for this radius restriction, presumably collaborating hard for this radius restriction, knowing that after the entry of the judgment, this greatest fear of his, that she could move out of the southern Illinois area, could come to fruition. He had a choice at that moment. Either enter into this agreement without a radius restriction or proceed to trial. He did a calculated risk. He entered into an agreement, quite frankly, that contemplates a change in circumstance based on relocation. It says that very term in Article I, Paragraph G and K of the Parity Agreement explicitly. And throughout this time, Ms. Fargo is basically saying she has, quote, no plans. No plans. And I think some of my argument in my brief addresses this no plans. No plans leaves room open for possibility. I think the trial court tried to define and tried to frame the statement that she was staying in southern Illinois. Staying in southern Illinois is a much more definitive position. No plans throughout always suggest the possibility of moving. I think even Adam going into that mediation wasn't satisfied with no plans. That's why he was lobbying for the radius. Even based on his own standard, no plans wasn't good enough for him. And he took a calculated risk in entering into this Parity Agreement, and I guess his greatest fears did come to fruition. Well, there's a distinction here, isn't there? He took a calculated risk that she would change her mind later and move, okay? But he didn't take a calculated risk that she'd already made up her mind. He relied on her statements that she had no plans. And the judge found, I mean, as I understand it, the fraud was that, you know, she'd already made up her mind to move before the judgment was entered. I believe the trial court found that the fraud was that there were specific statements in the Parity Agreement by which she acknowledged that she would not be moving. And just going through those specific statements, the first specific statement that the trial court alluded to was that the child would continue with the medical care at her current facility. Even in that provision, and the trial court doesn't quote the entire provision. I quote it in my statement of facts. It goes on to state that the parties acknowledge this is just where the child is currently receiving medical care. This is not, the parties contemplate that there could be a change in circumstances where the physician could be changed. The second item that the trial court alluded to was where Mr. Vargo could practice religious ceremonies during his visitation. In no way would that have any bearing on where Ms. Vargo resides, or is that even impacting Mr. Vargo's ability to bring the child to religious ceremonies when he has visitation? And the third, and probably I think the most troubling here, is the visitation. I pointed to the specific visitation. Thank you. Counsel? May it please the court. The appellant in her reply brief stated that it was Adam's burden to prove by clear and convincing evidence that Victoria had plans to relocate her residence upon entry of the child custody and joint parenting order. This is not about whether she could move determined after she signed the joint parenting agreement that she was going to move. As Justice Stewart indicated, this is about whether she had plans to move beforehand. And the record is cold in that you can't really tell from the record what the personal mannerisms were of the witnesses during the course of the testimony. But even a cold reading of the record shows that Victoria Vargo and Laura Hartwell were not credible. Laura Hartwell being her high school friend, being the person who was her employer when she woke up one morning 26 days after she told Adam Vargo, Don't worry. Don't worry. You've got midweek visitation at Marion, Illinois. You can just drive over and see your daughter's plays and her ballet things and her other school events. Don't worry about it. And 26 days later, she all of a sudden comes up with this concept that, oh, there's an old high school friend of mine that runs an autism academy in Chicago, Illinois. And gosh, you know, that's a job opportunity, so we need to move. It's certainly in the best interest of the child. The whole thing was just incredible. And then part of the written exhibits that are in there show an e-mail stream back and forth from Victoria Vargo and Laura Hartwell, wherein Victoria Vargo asked Laura Hartwell to write up some fringe benefits of the ability to keep the child on site at this autism academy and to have a daycare center there to be written for the court. And in that, it says even if there are not benefits, say that there are. And this is, of course, an e-mail stream going back and forth that happened within 45 days of the date that she entered into this dissolution agreement, incorporating the joint parenting agreement, and said you've got midweek visitation, you've got overnight's midweek, you're going to have lots of visitation. And then ultimately she sends him a message when she moves and says you can exercise your midweek visitation in Chicago, as if Dr. Vargo would drive five hours to Chicago on Wednesday afternoon to have midweek visitation. The whole thing just smelled horrible. And the judge, we believe, correctly ruled that indeed she, being Victoria Vargo, had a preconceived plan to move. And then along comes Laura, Tammy Day. And Tammy's testimony is so right on of what actually happened. Now, the appellant had the court believe that Tammy Day was somehow Mr. Vargo's aunt's best friend and knew everybody and was involved in circumstances. That's not the case at all. The testimony indicates that Tammy Day didn't know who Victoria Vargo was, didn't know who Adam Vargo was. In fact, had a subsequent discussion with Tori Vargo as they were traveling to an exercise place and figured out that that's who they were and that's who she was talking about when she had this dinner meeting two years before. It just, you know, there were so many deceitful actions. Telling Tammy Day the house was for sale, but not really. Telling Adam Vargo through her attorneys and verbally and telling the GAL she has no plans to move. Filing the petition for modification after she determined that she was going to move and asking the court to work through all that. We have all these depositions as is shown in the record. Then she withdraws the petition for modification and less than a week later moves and tells Adam Vargo that exercise your visitation in Frankfurt and knock yourself out. She stated several times through her attorneys that she had no plans to move. At the same time, if she wasn't so sneaky and devious and duplicitous and proud of herself for doing so, she would have probably gotten away with it. If she wasn't so proud of herself that she told Tammy Day two years in advance this is what I'm going to do. You know, we probably wouldn't be here today because she would have moved and claimed that she just jumped up like a goose one day and sent this email to her old high school friend. Twenty-six days later determined that we're going to have a resume and two weeks later we had this back and forth about what kind of benefits we have. And the suggestion to make those benefits up and make it good for the court even if those benefits don't exist. The appellant ignores Tammy Day's testimony, ignores the trial court's ability to judge the credibility of the witnesses. He refers to the transcript but picks the portions thereof out that are helpful to his case most certainly. But at the same time, as you read the transcript and the appellant's attorney wasn't there, you all weren't there, but the judge gets to determine the credibility of the witnesses. What's clear and convincing? The demeanor of the witnesses that can't be seen. The body language that gives the flavor of the witness. The time it takes to answer a question. The witness looking at the floor as she makes her answer. The witness looking at the ceiling. The witness rolling her eyes. The difficult witness that's evasive. In fact, in the record, it says, the judge says, there has been some evasive testimony. And the judge admonished this early. He had a little table talk with Ms. Fargo's attorney about whether Ms. Fargo was being evasive and somewhat argumentative with the court about that particular matter. The aggressive behavior of the witness, the aggressive argumentative posture of the witness. Sometimes, Your Honors, it's not just the answer to the question. It's the tone of voice, the disdain, and the demeaning smile as the answer is given. Now, the appellant talks about obfuscation of the testimony. I want to draw the Court's attention to something that I thought was unusual for somebody to talk about obfuscation. In the appellant's reply brief is the last sentence says, in sum, the circumstantial evidence that Adam asked this court to consider on appeal does not meet the burden of clear and convincing evidence, as that evidence does not pertain to facts that are relevant to the alleged misrepresentation and further requires inferences can result in an inopposite inference. I don't know whether they left words out or they inserted too many words or they engaged in obfuscation, but it's the darndest summary sentence I've ever seen to an appellant reply brief. In summary, for Mr. Fargo, the trial court determined the appellant had plans to move at the time the appellant entered into the joint parenting agreement. The court found that Dr. Fargo reasonably relied upon her statement because she had no plans to move. He incorporated things into the joint parenting agreement, the midweek visitation, and other matters presided by the trial court to ensure that she wasn't going – didn't have plans to go places. The trial court adopted the testimony of Tammy Deck and said that the appellant had definitive plans to move, which was credible, clear, and convincing. The testimony of Dr. Fargo was credible, clear, and convincing. The testimony of the appellant and the appellant's spring from high school and future employer was absolutely incredible. I mean, there were leaps of faith all over. And the manner in which some of that testimony was given could lead the trier of fact to make a determination that the testimony was disingenuous. When it takes an awful long time to answer a question, it oftentimes indicates, I would suggest to each of you, that somebody is thinking very, very hard about not what the answer is but what the answer should be to help her case. The trial court determined the credibility of the witnesses and weighed the evidence. And as this court has said many times, and as Justice Stewart indicated earlier, in a bench trial, the trial judge weighs the evidence and makes findings of fact. The appellate court defers to the trial court's factual findings and less error against the manifest weight of evidence. The judgment of the trial court will be upheld if there is any evidence to support it. We would submit to the court that there is evidence in the record to support the trial court's determination. The trial court will not substitute its judgment for that of the trial court as the credibility of the witnesses and complex of the testimony. The trial judge, as the finder of fact, had the opportunity to see and hear each witness, to observe the demeanor of each witness, and to assess the credibility of each witness. We respectfully submit that no opposite conclusion is warranted here. There is adequate evidence in the record to support the determination of the trial court that indeed there was a fraudulent misrepresentation, that Dr. Vargo reasonably relied upon that representation, and that injury resulted. I don't think that the appellate really meant to argue that Dr. Vargo should have presumed his wife was lying when she said she had no plans to move. It seemed like a counterintuitive argument to me. He was concerned about it, and to make sure that those concerns were taken care of, he incorporated into this marital settlement agreement. She rejected the ratings. She said, I'm not going to sign up for a ratings. But she gave him all the things in that agreement that made him have comfort that she was going to stay in the area. And she and her attorneys in the GAO said over and over again, she has no plans to move, when in fact she did. Your Honors, I have nothing further to present. If there's any questions, I'd be pleased to answer them. Thank you. Read the book. Going more directly to the issue of the witnesses that testified, I didn't get a chance to get to. Who I see as the primary witness that testified in this matter, and is not referenced in any sort of way in the trial court's order, is the GAO's testimony. The GAO testified, first and foremost, that Victoria never made the comment to her that she would not leave the Southern Illinois area. Even the GAO understands the distinction between no plans and would not leave. Now, the GAO testified about what transpired at the mediation session. Again, this does not appear in the trial court's orders. The GAO testified that Victoria was, quote, unquote, much less certain about her ability to stay in the Southern Illinois area. And also stated that she was absolutely adamant, and this is a quote from the GAO, she was absolutely adamant that she would not agree to a radius restriction, because she was unsure about her ability to stay in the Southern Illinois area based on money and based on her ability to get a job. So, we have a witness here that, quote, unquote, that doesn't have the proverbial dog in this fight. It's not Ms. Vargo, it's not Mr. Vargo, it's not someone's aunt, it's not anyone else. We have the GAO. The GAO understands the distinction one month prior to entry of the judgment that no plans doesn't necessarily equate with an agreement to stay. And I would ask your justices to look into the GAO's testimony. The GAO understands this distinction, that the GAO is the court's witness, that the court should, frankly, rely on the court's witness, that there's no bias as opposed to a witness that can be ditched whose memory is challenged. Now, counsel mentioned a moment ago that Ms. Vargo's testimony as well as Ms. Hartwell's testimony was completely incredible. There was no mention or no reference as to how their testimony was incredible. They were not impeached. Now, the trial court says in its order that Ms. Hartwell lied in stating that there was on-site daycare to this Chicago Academy for autism. However, when you look at the actual letter that Ms. Hartwell wrote, the very first sentence, contrary to what the trial court had written in its order, said, we do not have on-site daycare. It was never pointed out how Ms. Hartwell or Ms. Vargo's testimony or their evidence was somehow, it was the rest of it. Well, the rest of that paragraph basically said after that sentence. But we incorporate the kids, involve them, they're doing this, they're doing that, and basically saying we don't have a formal daycare, but we do care. We take care. So that's, the trial court could weigh that as in determining credibility also, couldn't it? I think the trial court could weigh that in determining credibility. But I think it has to be, her testimony somehow has to be rebutted or controverted. And the testimony was unrebutted and uncontroverted. I mean, a trial judge has the ability to sit there, listen to a witness, observe a witness, observe the witness's demeanor, observe the witness's cooperation once they understand a question, discount the normal reaction of non-lawyers saying I'm scared to be in a courtroom. And decide this person's lying through her teeth. I understand that this witness did not testify, Ms. Laura Hartwell did not testify before the trial court. Right. By stipulation they entered her deposition into the record. Right. But the trial court frankly inaccurately stated that she lied about there being on-site daycare when expressively in the first sentence of her letter says we do not have on-site daycare. We can make accommodations in these ways. And I don't think it was ever demonstrated that she was inaccurate in saying that there were these accommodations. They have a deposition transcript testimony that says here's the way we've made accommodations for me, Laura Hartwell. Here's the way we've made accommodations for other employees of ours. I don't think that was ever rebutted or somehow demonstrated that that was inaccurate. We ask that this court reverse and remand with instructions relative to the visitation, current visitation. Thank you. Thank you. Okay, so we'll take any other advice. Okay.